George T. Smith and Clela V. Smith v. Commissioner.
Smith v. Commissioner
Docket No. 93703.
United States Tax Court
T.C. Memo 1964-278; 1964 Tax Ct. Memo LEXIS 61; 23 T.C.M. (CCH) 1689; T.C.M. (RIA) 64278; October 22, 1964
*61 Petitioner formed Smith, Inc., in order to market grocery store supermarket check out counters. Its paid-in capital was $10,000. In 1950 Smith, Inc., ordered the manufacture of more than 100 check out counters, expending more than $90,000 for such inventory. Petitioner had attempted on behalf of the corporation to borrow funds, but had no success. The bank refused to loan money directly to the corporation. To secure most of the funds for the purchase of the check out counters, petitioner personally borrowed funds and then deposited the borrowed monies in Smith, Inc.'s bank account. Smith, Inc., was dissolved in 1957. At the time of dissolution, there was a balance due and owing to petitioner of $52,265.66. Petitioner, on his 1957 income tax return, claimed a business bad debt. Held: The advances made by petitioner to Smith, Inc., were placed at the risk of the business of the corporation and constituted equity capital. Held, further, petitioner was not in the business of organizing, promoting, managing, or financing businesses. Benjamin O. Schwendener, Jr., for the petitioners. Ronald S. Supena, for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in income tax of petitioners for the taxable year ended December 31, 1957, in the amount of $28,442.72. Petitioners have conceded that they are not entitled to deductions for certain legal fees and unsubstantiated travel expenses in the total amount of $878.01. The issues presented for our consideration are: (1) Whether the advances made by petitioner to George T. Smith, Inc., were contributions of equity capital or bona fide loans and (2) if the advances by petitioner to George T. Smith, Inc., were loans, whether the losses from the worthlessness thereof were nonbusiness bad debts *63 or losses incurred in a trade or business of promoting and financing business enterprises. Findings of Fact Some of the facts have been stipulated and, together with the exhibits therein identified, are incorporated herein by reference. Petitioners are husband and wife and during the year in issue resided at Route 3, Williams Road, Lansing, Michigan. They filed a joint Federal income tax return for the taxable year 1957 with the district director of internal revenue, Detroit, Michigan. Since Clela V. Smith is a party to this proceeding only because she filed a joint Federal income tax return for the year involved, George T. Smith will hereinafter be referred to as petitioner. Petitioner commenced work after completing only eight years of school. In 1919 he opened a food market in Lansing which was operated during the winter months only. Four years later, petitioner opened a market in Lansing known as George T. Smith's Meat Market. This operation, started with $50 of petitioner's money and a loan of $800, was later expanded and sold by petitioner in 1935. During the 1920's petitioner was also interested in a silver fox business and invested approximately $5,000 in a silver *64 fox farm near Leer, Michigan. In addition, he became interested in the purchase of oil leases and options in the Crystal Oil Fields near Alma, Michigan, and elsewhere. Petitioner's interest in oil, while not extensive, has continued through the years. During the 1930's petitioner was interested in grocery stores. On November 24, 1935, petitioner started a grocery store, Market Baskets, Inc., which by 1951 became a chain of six supermarkets, a warehouse, bakery, and a lunch counter. In 1951 the chain was sold to the National Tea Company of Chicago. Petitioner had financed the Market Baskets operation with loans and invested capital. In addition to the foregoing supermarket chain, petitioner was also engaged in operating a smaller store in partnership with Floyd Burley. This store was known as the Shoppers Market. It was largely financed by petitioner until he sold his interest to Burley in the late 1930's or 1940's. Shoppers Market was an experiment to see if a smaller store, using the buying power of a larger operation (Market Baskets, Inc.), could be run profitably. Petitioner began to acquire properties and tracts of land in Lansing. Some of the properties were later sold and *65 some he retained and still has today. In 1947 petitioner organized a real estate corporation known as Smith Realty Corporation (hereinafter referred to as Realty), for the purpose of holding and managing commercial real estate. Realty was initially capitalized for $25,000. However, on December 6, 1949, the corporation declared a 200 percent stock dividend and capitalization was increased to $75,000. For the first several years after incorporation Realty engaged in a substantial program of acquisition and developing of real estate. Most real estate was commercial but some speculative purchases of vacant land were made. Illustrative of the corporation's activity is the building of a warehouse, a bakery store, buildings and a parking lot. The books and records of Realty show that during its existence petitioner made loans or advances to the corporation and that the corporation made repayments to petitioner. Said books and records further reflect that Realty made loans or advances to petitioner. Upon dissolution on May 2, 1960, there was a balance owing to the corporation by petitioner. On his 1960 Federal income tax return, petitioner reported $227,248.69 as a long-term capital *66 gain upon the dissolution of Smith's Realty Corporation. Allied to petitioner's interest in real estate was an interest in building. During 1952 petitioner supplied all the money for the erection of a warehouse to the Esterline Construction Company of Lansing. Also in 1952 petitioner built three residential houses and subsequently sold them on land contracts. During the years 1955 through 1960, petitioner reported his profits on the installment method as long-term capital gains. In the late 1930's petitioner, together with Olin Esterline, who had invented an automatic pinsetter which would "revolutionize the bowling industry," erected a 22-lane bowling alley known as Lansing Recreation Center. The bowling alley operation continued until 1945 or 1946 when a fire completely destroyed the premises and most of the records. During its existence petitioner made large loans to the bowling alley. Some of the loans were evidenced by promissory notes. On April 25, 1949, George T. Smith, Inc., (hereinafter sometimes referred to as Smith, Inc.), was organized as a Michigan corporation for the purpose of marketing grocery store supermarket check out counters. Its authorized capital stock *67 was 500 shares of common stock at a par value of $100 per share. Of the 500 authorized shares of common stock of Smith, Inc., only 100 shares were issued. Petitioner acquired 80 shares in 1950. He acquired the remaining 20 shares on September 30, 1952, from Cleo C. Esterline and Thomas I. Smith, (petitioner's son) each of whom had owned 10 shares. Petitioner was the president and treasurer of Smith, Inc. His son was vice president and Esterline was secretary. Petitioner and Esterline had developed four patents on the check out counter. Applications were made for letters patent and these applications were assigned to Smith, Inc., on May 2, 1949. Letters patent were granted to Smith, Inc., in 1951 and 1953. Smith, Inc., filed an application for the trade name known as "No-Wait" on November 14, 1950, and said trade name was registered in the United States Patent Office on February 22, 1955. These four patents and one trade name constituted the principal assets, except for the $10,000 in cash contributed as paid-in capital, of Smith, Inc. No value was assigned to these patents and the trade name on the corporate books except for the legal fees incident to securing them. In the *68 early 1950's the products of Smith, Inc. received considerable free advertising in national magazines and trade journals. Copies of such stories and articles were published in "Collier's," "Supermarket News" and the "Progressive Grocer" magazines. An article in "Time" magazine also commented generally on the check out counter industry. Smith, Inc., ordered the manufacture of more than 100 check out counters expending more than $90,000 for such inventory. To secure most of the funds for the purchase of the check out counters, petitioner borrowed funds from the Bank of Lansing. He then deposited the borrowed monies in the bank account of Smith, Inc. On the books of the corporation such transactions, together with repayments by Smith, Inc., either to petitioner or directly to the bank in retirement of petitioner's notes, were recorded in an account entitled "Advances from Officers." Smith, Inc., had, through petitioner, attempted to borrow money directly. No success was ever attained. An analysis of the loans or advances to Smith, Inc., and repayments by the corporation is as follows: Advances
from
Repayment to
Balance
Petitioner
Petitioner from
due to
Year
to Smith, Inc.
Smith, Inc.
Petitioner
1950
$134,100.00
$46,000.00
$ 88,100.00
1951
82,850.00
65,500.00
105,450.00
1952
10,000.00
19,500.00
95,950.00
1953
14,000.00
81,950.00
1954
81,950.00
1955
4,000.00
77,950.00
1956
2,500.00
75,450.00
1957
500.00
23,684.34
52,265.66
*69 The quick sales and rapid inventory turnover anticipated by petitioner in 1950 and 1951, as a result of national advertising, never materialized. The check out counters did not sell. On December 23, 1957, a special meeting of the stockholders and directors of Smith, Inc., was held. At this meeting it was authorized and directed that Smith, Inc., be dissolved prior to December 31, 1957. At the time of dissolution there was a balance due and owing to petitioner of $52,265.66 as shown by the advances from officers account. The entire amount (less the value of an account receivable in the sum of $884.68 transferred to petitioner) was claimed by petitioner on his 1957 income tax return as a business bad debt, [1] giving rise to the present controversy. Petitioner reported a $10,000 long-term capital loss from the Smith, Inc., worthless stock. Petitioner was involved in other financial activities. On October 27, 1955, petitioner together with three men, Gray, Wandell and Rowland, formed a partnership known as William *70 I. Gray and Associates. This partnership was formed at Colorado Springs, Colorado, for the purpose of prospecting for uranium, gold and other precious metals in western United States. Petitioner was the managing partner with exclusive right to control the management of all partnership business. Petitioner was to receive a greater share of the profits and he agreed to advance, as loans, such sums as it was deemed necessary to promote the objects and purposes of the partnership. On or about April 1, 1956, petitioner and Gray, without discontinuing the existing partnership, formed a second mining partnership known as George T. Smith and Associates. Like the first partnership, its business was prospecting for uranium and other ores. Petitioner was active in the management and financing, through loans, of the partnership. The arrangement was similar to petitioner's role in the earlier partnership. Neither partnership was successful and petitioner suffered losses as a result of these activites. George T. Smith Distributors, Inc. (hereinafter referred to as Distributors), was formed on August 22, 1957, for the purpose of marketing "Johnny Weissmuller" swimming pools. The principal place *71 of business was Lansing, Michigan. Distributors was licensed to do business in Alabama, Georgia, Iowa, Michigan, Mississippi, North Carolina, South Carolina, Tennessee, Wisconsin and Minnesota. Pursuant to a distributorship contract between Distributors and Cinema Pools, Inc., of Studio City, California, the owner of the "Johnny Weissmuller" swimming pool franchise, the corporation was to set up dealers in each of the above states. Petitioner was president and treasurer and owned 51 percent of the stock of Distributors. The remaining stock was initially owned by Fred Kowalske of Lansing, Michigan, who was secretary of the corporation. The books and records of Distributors reflect that the sum of $10,000 was paid by petitioner as a capital contribution. Kowalske was to pay petitioner $4,900 for his percent of the stock but such payment was never made, and on August 28, 1958, Kowalske assigned all of his stock to petitioner. Petitioner made substantial advances to Distributors for which he received interest bearing notes. In several instances, the records of the corporation make reference to loans being made to the corporation by petitioner. Distributors was not successful and *72 on July 16, 1959, it was dissolved. Upon dissolution, losses were passed on to petitioner, then the sole shareholder. An election had been made in 1958 to cause the corporation to be taxed under subchapter S of the I.R.C. of 1954, as amended. Commencing in 1955 and continuing to 1958, petitioner together with certain other individuals, negotiated with the Acetogen Gas Company of Detroit. Said company holds a patent on acetogen gas, a propane gas with additives. Petitioner was attempting to secure a franchise which would permit him and his associates to market acetogen gas, plus certain other gases, throughout the United States. The planned corporation was to be known as Acetogen Gas Sales Company. Petitioner had prepared numerous legal documents for the purpose of finalizing the transaction with Acetogen Gas Company but all negotiations failed to materialize. Another business venture which failed to materialize was petitioner's attempt in 1955 and 1956 to form a corporation to be known as "Lake Fish, Inc.," for the purpose of cleaning and marketing of perch and other fish caught in the Great Lakes. It was petitioner's idea that fish could be purchased at a certain price from *73 the fishermen and that such fish could thereafter be processed and sold at a profit. The promotion failed to materialize because price negotiations with the fishermen failed. In 1954 petitioner purchased 4,000 shares of stock in a corporation known as "Sea Pak, Inc.," St. Simon Island, Georgia. Petitioner thereafter served as a member of the board of directors and on the executive committee of the corporation until 1957. At such time he resigned from both positions. In 1952 and 1953 petitioner made loans to Esterline for the construction of a motel at Houghton Lake, Michigan. These loans were eventually consolidated in 1954 and a long-term mortgage loan in the amount of $15,000, was secured by a mortgage on the motel premises. Throughout the years 1948 to 1957, petitioner has made numerous small and moderate sized loans to various individuals. Petitioner in making these loans was not obliged to take an active part in the operation of any business enterprise. Since 1951 petitioner has maintained a business office in Lansing where people seek to interest him in becoming financially interested in business ventures. Ultimate Findings of Fact The advances made by petitioner to *74 George T. Smith, Inc., did not constitute the creation of valid debts from the corporation to petitioner but were placed at the risk of the business and constituted equity capital. Petitioner's activities did not constitute being in a trade or business of promoting, organizing or financing business ventures. Opinion Our problem is to determine how the losses which petitioner incurred in respect to the advances which he made to Smith, Inc., should be classified for deduction by him for Federal income tax purposes. Respondent determined that the advances here in question were contributions to capital resulting in capital loss upon the liquidation of the corporation. In the alternative, respondent asserts that if the said advances of petitioner are found not to have been contributions to capital, they were nonbusiness loans which resulted in nonbusiness bad debts. Petitioner takes the position that any loss sustained from the advances to Smith, Inc., would be a business bad debt because the loss is proximately related to petitioner's business of promoting and financing speculative business enterprises. The respondent's determination is presumptively correct and the burden *75 is upon petitioner to show error on the part of the respondent. The position of petitioner fails to find support in the evidence and we are satisfied that it is without merit. The considerations on which the courts rely in determining whether particular advances represent equity or debt have been stated often and are now familiar. The result of these considerations in a given case is determined upon the facts and circumstances of the particular case. This being true, we think that no good purpose would be served by entering upon a detailed review of the decided cases relating to the instant subject matter. In deciding each of these cases on the basis of its peculiar facts, the courts have been careful not to lay down any all embracing rule of general application. But such cases have pointed out or suggested various tests or criteria which will be applied in seeking out the realities, among which are the following. Was the capital and credit structure of the new corporation realistic? What was the business purpose, if any, of organizing the new corporation? Were those making the advances *76 the actual promoters and entrepreneurs of the new adventure? Would those making the advances bear the principal risk of loss attendant upon the adventure? Would they participate in management? Would other investors make such advances? Was the corporation able to obtain loans directly from outside lending institutions? , affd. per curiam (C.A. 2, 1951); (C.A. 7, 1959); , affd. (C.A. 7, 1958); , modified on other grounds, (C.A. 6, 1963); , affd. (C.A. 9, 1960). No one characteristic or factor can be said to be decisive in the determination of whether the advances are risk investments in the corporation or debts. As soon as Smith, Inc., began doing business in 1950 it became necessary for petitioner to advance funds to the corporation in order that it might purchase *77 inventory and meet other current operating expenses. The corporation had only $10,000 in its capital account. In 1950 Smith, Inc., ordered more than 100 check out counters and expended over $90,000 in that year for this inventory. At the end of 1950 the corporation had a net advancement from petitioner of $88,100. By December 31, 1951, this amount had grown to $105,450. Petitioner, on behalf of Smith, Inc., attempted to borrow funds from the Bank of Lansing for the purpose of purchasing the initial inventory of the business. The bank refused to loan the money directly to Smith, Inc. Because of the inability to obtain funds for Smith, Inc., from outside sources, petitioner advanced the necessary amounts to the corporation. As we said in , page 33: When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business. *78 * * * In the light of the above, we are led to the conclusion that the advances involved in this case were made for the primary purpose of starting and getting under way a new and undercapitalized corporation. The repayment thereof depended upon the success of the new business. Under the circumstances the adverans by petitioner to Smith, Inc., did not constitute valid and existing debts but were in the nature of capital contributions. We are satisfied, in any event, that assuming the advances are characterized as loans, they nevertheless cannot qualify as business loans. Petitioner's argument is that the loss from the worthlessness of his advances to Smith, Inc., is deductible as a business bad debt because the loss is proximately related to petitioner's business "of borrowing and financing through capital investments and loans, various and sundry commercial funds." He argues that his business was that of investing his time and his money in widely varied and speculative business ventures. To have a loss such as is incurred by petitioner recognized *79 as a business bad debt, it must have been sustained in the course of promoting, financing or lending activity carried on so extensively as to elevate that activity to the status of a separate business. (C.A. 4, 1958), affirming ; (C.A. 2, 1953), certiorari denied ; ; ; , affd. (C.A. 4, 1960). We do not feel, upon examination of the record, that petitioner has met his burden of establishing the existence of a separate and distinct business as a promoter or lender. Petitioner states that the cases of ; ; and "are indistinguishable in principle and on their facts from the instant case on the issues of petitioner's trade or business and on the relationship of the loans to petitioner's business. *80 " Petitioner also relies on (C.A. 6, 1959). The United States Supreme Court, however, in , disapproved the rationale of these cases. In , the question presented was whether the taxpayer's activities in connection with several corporations in which he held the controlling interest could be characterized as a trade or business in order that a debt owed to him by one of the corporations be treated as a business rather than as a nonbusiness bad debt. The Court held untenable and rejected the argument that "one who actively engages in serving his own corporations for the purpose of creating future income through those enterprises is in a trade or business." In a footnote the Court stated: To the extent that they hold or contain statements to the contrary, we disapprove of such cases as * * * (C.A. 6th Cir.) * * * ; ; *81 * * * To determine whether the activities of a taxpayer constitute carrying on of a business, an examination of the facts in each case is required. . There is no evidence that petitioner planned to dispose of George T. Smith, Inc., after its successful promotional or organizational phase. We believe his purpose in establishing Smith, Inc., was to facilitate the sale of check out counters and not to develop that corporation for sale as a going business to customers in the course of any business of promoting or financing business ventures. Petitioner's conduct as evidenced by the record shows that he has never treated his gains or losses for tax purposes as resulting from a separate trade or business. Furthermore, there is no evidence that petitioner ever withdrew from a profitable venture conducted in corporate form and treated his profits therefrom as ordinary income. , affd. (C.A. 4, 1960). Moreover, in the instant case, petitioner, in the *82 year in issue, did not file a Schedule C, Profit (or Loss) From Business or Profession. It is well settled that activities involving protection, enhancement, or management of one's investments, however extensive or time consuming, do not constitute a separate trade or business. ; (C.A. 2, 1953), certiorari denied ; and . The Supreme Court in , said at p. 202: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from *83 the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice. * * * In the light of the facts before us, we think the only conclusion we can reach is that petitioner was not in the business of lending money to or promoting business enterprises or organizations. Under the circumstances, had we found that any or *84 all of the advances made by petitioner were not contributions to capital they would be nonbusiness loans to be treated as capital losses under section 166(d)(1)(B) of the Code of 1954. Decision will be entered under Rule 50. Footnotes
1. Through error, the amount claimed on the 1957 income tax return was $51,880.98. Petitioner agrees that the amount which should have been claimed was $51,380.98.↩